Hovanes Margarian, SBN 246359
hovanes@margarianlaw.com
THE MARGARIAN LAW FIRM
801 North Brand Boulevard, Suite 210
Glendale, California 91203
Telephone Number: (818) 553-1000
Facsimile Number: (818) 553-1005

Attorneys for Plaintiff,
Hakop Demirchyan

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HAKOP DEMIRCHYAN, an individual, on behalf of himself and as class representative for all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BMW OF NORTH AMERICA, LLC, a Delaware Limited Liability Company; BMW AG, a Munich, Germany entity; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Breach of Express Warranty<br>2. Breach of Implied Warranty<br>3. Breach of Warranty (Song-Beverly Consumer Warranty Act), Civil Code § 1790, *et seq*.;<br>4. Breach of Warranty (Magnuson-Moss Warranty Act), 15 U. S. C. § 2301 *et seq.;*<br>5. Violation of the California Unfair Competition Act (“UCL”), Business and Professions Code § 17200, *et seq.*<br>6. Violation of The Racketeer Influenced And Corrupt Organizations Act (“RICO”), of 18 U.S.C. § 1962(c)-(d)<br><br>**DEMAND FOR JURY TRIAL** |

# COMPLAINT

COMES NOW, Plaintiff, HAKOP DEMIRCHYAN, an individual, and as class representative for the putative class members, who leased and/or purchased a BMW i3 with Range Extender ("BMW i3 REX") since 2014 to the present, by and through Plaintiff's attorneys, with the Class Action Complaint for Damages and Equitable Relief against Defendants, BMW OF NORTH AMERICA, LLC, a Delaware Limited Liability Company; BMW AG, a Munich, Germany entity; and DOES 1 through 100, inclusive, alleges and affirmatively states as follows:

## INTRODUCTION

1. BMW AG is a manufacturer of BMW branded goods, vehicles, their parts, accessories, and software.

2. BMW of North America, LLC ("BMW NA") is the U.S. distributor of BMW branded goods, vehicles, their parts, accessories, and software.

3. Since 2014 to present, BMW NA distributes two U.S. versions of the BMW i3 electric vehicles: the fully electric BMW i3 model, and the BMW i3 REx model with a range extending 35 bhp gasoline engine ("BMW i3 REX," the "REX model," and "REX"), both manufactured by BMW AG.

4. On BMW i3 REX, the range extending gasoline engine ("Range Extender") starts automatically when the charge of the battery powering the electric motor depletes to 6.5%. When operational, the Range Extender does not power the wheels of the vehicle: instead, it serves as a generator to charge the battery of the electric motor at the maximum rate of 21 kwh to try to constantly preserve the battery's state of charge of 6.5% so the vehicle can continue its operation on electric power. The Range Extender, however, cannot preserve the battery's state of charge of 6.5% when the Vehicle uses more than 21 kwh for its operations.

5. Since BMW i3 REX was always advertised by BMW NA as a vehicle with an extended range (150 miles and 180 miles per charge), the Manufacturer's Suggested Retail Price ("MSRP") of the BMW i3 REX vehicles was always several thousand

dollars more than the MSRP of the fully electric BMW i3 vehicles, which have shorter advertised range per charge (81 miles and 114 miles per charge).

6. Relying on BMW i3 REX model's extended range, Plaintiff Demirchyan leased one such REX vehicle, and shortly discovered that the vehicle suddenly loses power when the Range Extender is operational, making it unsafe to use the range extending capabilities of the REX model ("Power Loss").

7. Immediately after discovering the safety defect Plaintiff presented his vehicle to a BMW authorized repair facility pursuant to the terms of his warranty agreement. On the first documented occasion, the repair facility stated that it was unable to duplicate Plaintiff's concern and that the vehicle was operating as designed. On the second documented occasion, the repair facility submitted the issue to BMW NA technicians who advised the repair facility that the vehicle was operating as designed and provided the repair facility with an "Operating Strategy Document" to "better explain vehicle operation" to the Plaintiff.

8. Soon thereafter, Plaintiff learned that all U.S. models of BMW i3 REX vehicles suffer from the same or a similar defect which causes them to lose power to some degree when the Range Extender is operating.

9. After BMW NA's multiple refusals to repair Plaintiff's vehicle pursuant to the terms of the warranty agreement, Plaintiff filed this action on behalf of himself and all others similarly situated to remedy the situation.

10. Had BMW NA disclosed to Plaintiff that the BMW i3 REX vehicles suffer from one or more defects that cause Power Loss prior to Plaintiff's lease, Plaintiff would not have even leased the REX model.

## JURISDICTION AND VENUE

11. The Court has original jurisdiction over this action pursuant to Class Action Fairness Act of 2005, 28 U.S.C. §1332.

12. Minimal-diversity of citizenship requirement under 28 U.S.C. §1332(d)(2)(A) is met, because Plaintiff Demirchyan is a citizen of the State of California

and Defendant BMW NA is a citizen of the State of New Jersey per 28 U.S.C. §1332(d)(10).

13. The aggregate number of the putative class members is far greater than 100 for the purposes of 28 U.S.C. §1332(d)(5)(B), because the putative class involves persons who purchased or leased BMW i3 vehicles in the United States from 2014 to present. Plaintiff is informed and believes that, in 2015 alone, 11,024 BMW i3 electric vehicles were sold in the United States, more than 50% of which were Class Vehicles equipped with a Range Extender.

14. The aggregate amount-in-controversy, exclusive of interest and costs is far greater than the $5,000,000 jurisdictional amount under 28 U.S.C. §§1332(d)(2) and 1332(d)(6). Plaintiffs are informed and believe that the difference in value between the fully electric BMW i3 vehicles and the REX models of BMW i3 vehicles is approximately $3,500. Plaintiff and the putative class members would not have paid said $3,500 to purchase the REX models of BMW i3 vehicles, but for BMW NA's unfair, unlawful and fraudulent business practices. Since in 2015 alone at least 5,512 BMW i3 REX vehicles were sold in the U.S., the total aggregate amount paid by putative class members but for BMW NA's unlawful business acts is $19,292,000.00 ($3,500 x 5,512 = $19,292,000.00).

15. The venue is proper, because the named Plaintiff leased the Subject Vehicle from Pacific BMW, in Glendale, CA and BMW NA breached its express warranty, in Glendale, CA, within the jurisdiction of the Central District of California.

## PARTIES

16. Plaintiff, HAKOP DEMIRCHYAN ("Plaintiff" or "DEMIRCHYAN"), is and was at all times relevant herein an individual residing in Los Angeles County, State of California, who leased a BMW i3 REX (the "Subject Vehicle") in the State of California.

17. Plaintiff appears in this action on behalf of himself, on behalf of all others similarly situated, and pursuant to Business and Professions Code §§ 17200 *et seq.* and 17500 *et seq.*, on behalf of the general public in his capacity as a private attorney general.

18. BMW OF NORTH AMERICA, LLC ("BMW NA"), is and was at all times relevant herein a Delaware Limited Liability Company, licensed to do business and doing business throughout the State of California and the United States, with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff Lake, NJ 07667. BMW NA is engaged in the manufacture, sale, and distribution of motor vehicles and also markets, supplies, and warrants BMW automobiles to the public at large through a system of 378 authorized dealerships, including Pacific BMW.

19. BMW AG is the German based company that designs, manufactures, promotes, markets, and distributes said Subject Vehicles worldwide, in California and the United States, with its headquarters at Peteuling 130, Munich, Germany 80809. Through its subsidiaries and agents, BMW AG, designs, manufactures, promotes, markets, and distributes Subject Vehicles, in a continuous manner in California and the United States.

20. Plaintiff is informed and believes, and based thereon alleges that Defendants DOES 1 through 100 are corporations, or are other business entities or organizations of a nature unknown to Plaintiff.

21. Plaintiff is unaware of the true names of Defendants DOES 1 through 100. Plaintiff sues said defendants by said fictitious names, and will amend this Complaint when the true names and capacities are ascertained or when such facts pertaining to liability are ascertained, or as permitted by law or by the Court. Plaintiff is informed and believes that each of the fictitiously named defendants is in some manner responsible for the events and allegations set forth in this Complaint.

22. Plaintiff is informed, believes, and based thereon alleges that at all relevant times, each Defendant was a developer, designer, manufacturer, distributor and lessor/seller of vehicles, was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest

and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other Defendants so as to be liable for their conduct with respect to the matters alleged in this complaint. Plaintiff is further informed and believes, and based thereon allege that each Defendant acted pursuant to and within the scope of the relationships alleged above, and that at all relevant times, each Defendant knew or should have known about said defective REx, authorized, ratified, adopted, approved, controlled, aided and abetted the conduct of all other Defendants. As used in this Complaint, "Defendants" means "Defendants and each of them," and refers to the Defendants named in the particular cause of action in which the word appears and includes BMW and DOES 1 through 100.

23. At all times mentioned herein, each Defendant was the co-conspirator, agent, servant, employee, and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, and/or joint venture and with the permission and consent of each of the other Defendants.

24. Plaintiff makes the allegations in this Complaint without any admission that, as to any particular allegation, Plaintiff bears the burden of pleading, proving, or persuading, and Plaintiff reserves all of Plaintiff's rights to plead in the alternative.

## BACKGROUND AS TO PLAINTIFF HAKOP DEMIRCHYAN

25. On or about March 8, 2015, Plaintiff leased from Pacific BMW, an authorized BMW dealer, a new 2014 BMW i3 REX bearing the Vehicle Identification Number: WBY1Z4C57EV275575 (the "Subject Vehicle"), manufactured by BMW AG and distributed by BMW NA.

26. In consideration for the lease of the Subject Vehicle, BMW NA issued and supplied to Plaintiff several written warranties, including a four (4) year or fifty thousand (50,000) mile factory warranty, as well as other stated warranties fully outlined in the Manufacturer's Warranty Booklet.

27. All such warranties were provided to the Plaintiff and not to the Pacific BMW. Plaintiff, as the end user and the consumer, is the intended beneficiary of every express and implied warranty that came with the lease of the Subject Vehicle.

28. Prior to leasing the Subject Vehicle on March 8, 2015, Plaintiff visited BMW NA's official website at www.bmwusa.com ("BMW Website") where he learned about the difference in range of the fully electric BMW i3 model and the BMW i3 REX model. Plaintiff read on the BMW Website that the model with the range extender has longer driving range per charge than the model without the range extender, and based on said difference in range decided to pay extra to lease the model with the range extender.

29. While on the BMW Website, Plaintiff did not find any disclosures that the REX model would suddenly lose power when the range extender operated. Had BMW NA disclosed said information on the BMW Website, Plaintiff would have learned about the Power Loss prior to entering the lease and would not have leased the REX model.

30. Furthermore, on March 8, 2015, immediately prior to entering the lease, Plaintiff discussed the differences between the driving range of BMW i3 REX and the fully electric BMW i3 with the salespeople at Pacific BMW, an authorized BMW dealer and repair facility. At no point during the discussion, did the salespeople disclose to Plaintiff any information about the Power Loss in REX models. Had the salespeople disclosed the information about the Power Loss to Plaintiff prior to purchase, he would have learned about it and would not have leased the REX model.

31. On or about March 8, 2015, Plaintiff took possession of the Subject Vehicle and after less than 6 months and 7,000 miles of using the vehicle, Plaintiff experienced the Power Loss defect that substantially impairs the use, value, enjoyment, and safety of the Subject Vehicle. When the Power Loss occurred Plaintiff's vehicle suddenly decelerated and was unable to accelerate and to maintain speeds above 35-40mph.

32. The Power Loss defect was present in the Subject Vehicle at all times, including at the time Plaintiff entered the lease of the Subject Vehicle. The Power Loss occurred multiple times while the vehicle was still under BMW NA's express warranty.

33. Immediately after experiencing the Power Loss, Plaintiff presented the Subject Vehicle to BMW authorized dealers while the vehicle was still under BMW NA's express warranty coverage period.

34. On the first *documented* repair attempt of the Power Loss defect, which occurred on August 8, 2015, with 6160 miles on the odometer of the Subject Vehicle, Pacific BMW, the authorized BMW dealer where Plaintiff presented his vehicle for repairs, stated that it could not duplicate Plaintiff's concern and that the vehicle was operating as designed.

35. On the second *documented* repair attempt of the Power Loss defect, which occurred on August 14, 2015, with 6328 miles on the odometer of the Subject Vehicle, Pacific BMW submitted an online inquiry to BMW NA technicians through BMW's internal PUMA issue reporting and resolution system. BMW NA's technicians responded to the inquiry by stating that the vehicle was operating as designed and provided Pacific BMW with an "Operating Strategy Document" to "Better explain vehicle operation" to Plaintiff.

36. Despite several repeated attempts to repair the Power Loss in a non-conforming vehicle, that is unsafe for ordinary users as it places the driver/occupants and bystanders at risk for their safety and lives and limb, BMW NA, through its authorized dealers refused and/or were unwilling to repair the Subject Vehicle, within a reasonable number of attempts.

37. Due to the Power Loss defect, Plaintiff justifiably lost confidence in the Subject Vehicle's safety and reliability. Said defect substantially impaired the use, value, and/or safety of Plaintiff's BMW i3, separate and apart from the consideration paid for the REX on the Subject Vehicle.

## ALLEGATIONS COMMON TO PLAINTIFF AND THE PUTATIVE CLASS

38. Plaintiff files this class action on behalf of himself, and all others similarly situated ("class members" or "members of the class") and the general public, for damages and/or restitution, as appropriate, for the Class from defendants, BMW NA and BMW

AG, for developing, designing, manufacturing, distributing and selling vehicles which are unsafe and fail to perform as warranted.

39. The factual allegations made in the Seventh Cause of Action based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)-(d) are incorporated herein by reference. Any inconsistent factual allegations are made as an alternative theory of liability pursuant to FRCP 8(d)(2). Plaintiff bears the burden of proving the alternative theories and hereby prays for leave to amend his pleadings to conform to the evidence presented at trial.

40. BMW NA develops, distributes, markets, advertises and sells BMW branded goods and vehicles, their parts and software, in the United States, designed, manufactured, developed by its parent company, BMW AG.

41. BMW NA has a system of authorized BMW dealerships throughout the United States through which it distributes, markets, advertises and sells those BMW branded goods and vehicles.

42. BMW NA's authorized dealerships are tightly controlled by BMW NA and are the agents of BMW NA. BMW NA controls the marketing practices of BMW authorized dealerships, the repair facilities within those dealerships, and even the appearance of said dealerships. Additionally, BMW NA trains the personnel at BMW authorized dealerships.

43. BMW NA and BMW AG exercise said control through prewritten policy and procedure manuals, inclusive of repair manuals, warranty manuals, technical training manuals, and by issuing Service Information Bulletins (SIBs) as need arises.

44. Beginning from 2010, if not before, BMW NA developed, distributed, marketed, advertised and sold at least two variations of BMW i3 electric vehicles: BMW i3 REX vehicles with a Range Extender and fully electric BMW i3 vehicles.

45. When compared with the fully electric i3, the electric motor in the REX model is supplemented by a 647 cc two-cylinder engine, which starts only automatically, when the battery's state of charge is depleted to approximately 6 percent.

46. The advertised and represented range of the BMW i3 REX is thus at least 60 miles longer than the range of the fully electric BMW i3.

47. Since BMW NA has always advertised and represented that the BMW i3 REX has a longer range, its MSRP was at least $3,500.00 higher than the MSRP of the fully electric counterpart.

48. Said $3,500.00 plus difference in the MSRP of the REX model directly and proportionally increases the agreed upon cash value of the vehicles, which directly and proportionally increases the monthly lease and/or purchase, interest, and tax payments.

49. Although BMW i3 REX vehicles are more expensive than the fully electric counterparts, they suffer from one or more defects in materials and/or workmanship ("Manufacturing Defects") and/or design which cause these vehicles to abruptly lose power when the Range Extender operates.

50. Due to said power loss, all capabilities of the vehicle are severely limited, causing substantially reduced cruise and maximum speed, reduced acceleration, limited operation of the A/C system and other on-board systems.

51. To make matter worse, when the vehicle is traveling at highway speeds or uphill, the sudden power loss causes an abrupt and dangerous deceleration during which the brake lights of the vehicle do not engage. Consequently, neither the driver of the REX vehicle, nor the drivers following the REX vehicle are put on notice of the abrupt deceleration.

52. The sudden and abrupt Power Loss occurs on all BMW i3 REX vehicles, but varies in some degree from one vehicle to another.

53. The models of vehicles at issue include 2004 – 2016 BMW i3 REX vehicles equipped with a Range Extender. ("Subject Vehicle(s)" or "Class Vehicle(s)").

54. Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced a sudden abrupt deceleration caused by the Power Loss defect.

55. Complaints posted on the Internet by consumers demonstrate that the Power Loss varies from one vehicle to another:

a. "My 2015 [BMW i3] lost power on the freeway going 75 mph...dropped to 35 mph....in less than 10 seconds!!" - Cheyanne

b. "Driving up slight incline in highway in Bay Area and speed dropped to 40mph. Pretty scary" - Mark P.

56. Plaintiff is informed and believes and thereon alleges that before the distribution of the BMW i3 REX in the U.S. market, BMW NA negotiated with California Center for Sustainable Energy which administers the clean vehicle rebate program of the California Air Resources Board to be able to make necessary changes to the U.S. model of the BMW i3 REX so it qualifies under the clean vehicle rebate program under a special exceptional category that provides the same rebates as are provided to the *fully electric* vehicles.

57. Plaintiff is informed and believes and thereon alleges that BMW NA provided the criteria for the approval for the program to BMW AG.

58. Since the original version of the European BMW i3 REX did not qualify for the criteria for the approval, BMW AG modified or caused to be modified the software of the European Model to fit under the special criteria: BMW AG removed the function enabling a manual start of the Range Extender, limited the use of the fuel tank to 1.9 gallons, and programmed the Range Extender to start only automatically when the vehicle charge drops to 6.5%. These modifications to the software enabled the U.S. version of the BMW i3 REX to become eligible for the rebates and tax credits defined by specific criteria under the federal and California regulations.[1]

59. In 2011, if not before, BMW AG road tested the vehicles with the updated software for the U.S. market to learn about the impact of the changes made based on the criteria set by the clean vehicle rebate program. Through those tests, BMW AG gained exclusive knowledge that the BMW i3 REx, as manufactured and designed for the U.S.

---

[1] By way of example, 13 CCR Section 1962.1 and Internal Revenue Code Section 30D.

market suffered from the Power Loss safety defect when the range extender operated pursuant to the new software.

60. Upon information and belief, Defendant BMW NA, as the distributor of BMW vehicles, their parts, and software, gained exclusive knowledge about the Power Loss defect prior to start of distribution and sale of each of the BMW i3 REX vehicles from sources not available to Plaintiff and Class Members, which included the following:

a. Technical Training manuals about the Class Vehicles provided by BMW AG and BMW Group University to BMW NA which described the Range Extender system and its limitations;

b. Documents listing all component parts of the Class Vehicles, including the component parts of the electric powertrain system and the Range Extender, provided by BMW AG and/or related entities to BMW NA, which demonstrated that the Range Extender could not support the regular and safe operation of the Class Vehicles;

c. Software code of the Class Vehicles, including the software operating the Range Extender system provided by BMW AG and/or its related entities to BMW NA, which demonstrated that the vehicles were not programmed to warn the driver of the REX vehicles and the drivers following the REX vehicle in situations when Power Loss causes deceleration;

d. Service and repair manuals of Class Vehicles provided by BMW AG and/or its related entities to BMW NA, which included information about the composition and construction of the Range Extender system, which demonstrated that defects in manufacturing process might cause an uncontrolled Power Loss varying in different degrees in different vehicles;

e. Other technical and informational materials and data provided by BMW AG and/or its related entities to BMW NA containing information about the components, safety, software, construction and repair of the Range Extender system.

61. Moreover, prior to Plaintiff's lease/purchase, BMW NA received notice about the dangerous nature of REX models from early consumer complaints made directly to BMW NA and to BMW NA authorized dealerships that were escalated to BMW NA through the PUMA consumer complaint reporting and resolution system, which is not accessible to the public, Plaintiffs and Class Members.

62. Defendant BMW NA, thus, knew that the REX models were unsafe before Plaintiff and the Class Members purchased/leased their Vehicles. Defendant BMW NA knew that the REX models were unsafe even before beginning the distribution of Class Vehicles as alleged herein.

63. Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiff and others similarly situated.

64. Even though BMW NA knew that the REX models were dangerous, it distributed and marketed the Class Vehicles without disclosing said information to Plaintiffs and the Class Members pre-purchase/lease.

65. Plaintiff is informed and believes and based thereon alleges that BMW NA and its authorized dealerships acted in concert and continued to actively conceal the defect even after the Plaintiff and the putative class members complained; by uniformly denying the existence of the defect, by not documenting the visits of Plaintiff and the Class Members complaining about the defect to the BMW authorized dealerships, by not documenting Power Loss related complaints pursuant to BMW NA's regular business practices, and by labeling the defect a design decision.

66. Since the start of the distribution of BMW i3 REX vehicles, BMW NA represented on the BMW Website and on marketing and advertisement materials that the driving range of the REX vehicles is EPA estimated 150 miles per charge (180 miles for the 2017 model year), but failed to disclose material facts about the Power Loss defect, including the reduced drivability and the safety risks of operating the vehicles when the Range Extender is operational, beyond the range of the fully electric models of 81 miles

and 114 miles per charge.

67. Furthermore BMW NA failed to disclose other material facts about the ability to reach the stated range of 150 or 180 miles. As such, said range can be reached only if:

a. The vehicle is not driven over 55 mph; the air conditioner is not used for any meaningful length of time; the heater is not used for any meaningful length of time; the headlamps are not used; the defogger is not used; and no hills or inclines are encountered. Unequivocally, if any of these component parts are used in the conjunctive, the battery will drain even faster.

b. Since the Range Extender engages only when the battery is at or about 6.5% state of charge, to the extent that the components are used, the power from the battery will drain at a more rapid rate than the Range Extender will be able to charge. Consequently, the vehicle will ultimately fail for lack of power. As discussed above, the relationship between the battery and range is symbiotic to the extent that a drain on the battery concomitantly reduces the range.

68. The Power Loss defect is material, *inter alia*, because it renders Class Vehicles inherently unsafe and dangerous for Plaintiff, putative class members, their passenger(s), and persons in other vehicles travelling behind the REX vehicles on the roadways, and because the Class Vehicles were always defective, including during BMW NA's original manufacturer's warranty.

69. BMW NA had a duty to disclose the Power Loss defect, because it had exclusive knowledge about said material defect from sources not reasonably discoverable by Plaintiff and the putative class members, because BMW NA actively concealed the Power Loss defect by not acknowledging that the REX vehicles were defective, and by not documenting consumer complaints regarding the defect, and because BMW NA made representations about the extended range of BMW i3 REX

vehicles, but failed to disclose material facts about the Power Loss defect and reduced drivability of the vehicles beyond the range of the fully electric model.

70. Plaintiff and the putative class members, as reasonable persons, relied on the fraudulent concealment of the Power Loss defect by BMW NA, were deceived, and purchased and/or leased Class Vehicles.

71. Plaintiff and the putative class members suffered economic damage because they would not have purchased/leased the Class Vehicles had they known Class Vehicles were equipped with the defective REX system and would have purchased/leased the lower priced fully electric BMW i3 vehicles or vehicles of other manufacturers instead.

72. Through its tightly controlled and managed dealership network of 378 centers, BMW distributed to the Putative Class Members and the general public numerous pamphlets, brochures, and specification sheets that emphasized or focused on the quality and safety of the Class Vehicles here at issue. But more than that, in order to ensnare customers and buyers, BMW promised tax credits, rebates and promised a range of 150 miles on the REx. These affirmations of fact are materially false, and known to be false by BMW. As to the range of the BMW i3 REx, as it is practically impossible to get 150-mile range even if one is the most conservative driver in the world, and the range depends on operating the vehicle in a dangerously underpowered condition.

73. At all relevant times, the BMW entities have been aware of the defective BMW i3 Class Vehicles, and have consciously disregarded the rights and safety of Plaintiff, members of the Class and the general public. Despite said knowledge, the BMW entities, however, have failed to notify owners and lessees of the Class Vehicles of the defects associated with their continued operation as alleged herein, and except as alleged herein, they refused to honor the 48-month or 50,000-mile warranty, and claim the vehicles are "operating as designed."

74. At all relevant times, the BMW entities have not fully disclosed to purchasers or lessees of the Class Vehicles, information regarding the possibility of vehicle losing power, not being able to accelerate adequately, or go up inclines, caused

by the REx defect on the Class Vehicles as detailed herein, nor have they disclosed the true facts that the BMW entities either knew or recklessly or negligently disregarded the existence and reasons for this inherent defect for years.

75. Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiff and others similarly situated.

76. The defective REx system on the Class Vehicles has resulted and will continue to result in significant loss and damage to the Putative Class Members, including but not limited to, interference with use and enjoyment, failure to honor the express and implied warranties, significant diminution in value, and paying significant money for the REx that cannot be safely used.

77. Plaintiff is informed and believes and thereon alleges that the benefit to the society from BMW NA's conduct alleged above is clearly outweighed by the dangerous nature of the REX models in which the Power Loss defect causes abrupt deceleration, inability to accelerate, and inability to travel at highway speeds.

78. Plaintiff is informed and believes and thereon alleges that Defendants' practice in using the defective Range Extender system in the Class Vehicles, and concealing its defective nature has a direct impact on competition between BMW NA and other car manufacturers and distributors. Being deceived by BMW NA's concealment, consumers are likely to purchase or lease the Class Vehicles as opposed to electric or hybrid vehicles with a similar driving range produced by other car companies, giving BMW NA a competitive advantage over other car manufacturers and distributors.

79. The Office of Transportation and Air Quality/Environmental Protection Agency provides for a $7,500 tax credit to consumers of BMW i3 REX.

80. The California Air Resources Board classifies the BMW i3 REx as a Transitional Zero Emission Vehicle ("TZEV"), and provides for a $2,500 rebate to consumers of BMW i3 REX.

81. Thus, BMW NA and BMW AG, have an incentive to emphasize the benefits provided by the addition of the REx to the purely electric vehicle, and downplay the negatives of such a hybrid. The fraudulent suppression of material facts affects the market attractiveness of said vehicle as was addressed by the California Supreme Court in the case of *Mirkin v. Wasserman*, 5 Cal. 4th 1082 (1993).

82. The collective BMW entities know of the defective nature of the BMW i3 with REx, but they are suppressing the facts such as the loss of power and significant safety risks it poses, all to the effect of increasing sales and increasing rebates and/or tax incentives.

83. Consumers are relying to their detriment on the material representations by BMW NA and BMW AG of the range and the safety of said BMW i3 with REx, the rebates and tax incentives available to said vehicle, and are misled by the concealment of said knowledge regarding the range, power loss, and financial incentives.

84. By failing to document these visits and provide repair orders, the BMW entities systematically deprived Plaintiff and other Putative Class Members of their rights by distorting the Class Vehicles' repair histories.

85. At all times, relevant, Plaintiff is informed and believes, and based thereon alleges that the BMW entities have refused to provide the free repair, replacement, recall or retrofitting of the REx system to owners of the affected vehicles and have refused to reimburse consumers who have paid to have the REx systems repaired or reprogrammed in their vehicles.

86. Class Vehicles are dangerous for Plaintiff, putative class members, their passenger(s), and 3rd parties when used for their ordinary purpose of providing transportation because of the Power Loss defect.

87. Plaintiff is informed and believes and thereon alleges that Class Vehicles are not the same quality as those generally accepted by trade since other electric and hybrid passenger vehicles, including the Chevrolet Volt equipped with substantially

similar technology, do not exhibit the sudden and abrupt Power Loss, abrupt deceleration, inability to accelerate, and/or travel at highway speeds.

88. Plaintiff is informed and believes and thereon alleges that Class Vehicles were not substantially free of defects, because the REX vehicles contain the Power Loss defect that interferes with the drivability of the vehicles.

89. Plaintiff Demirchyan provided a notice to BMW NA regarding BMW NA's breach of implied warranty due to the Power Loss defect through his visits to BMW NA's authorized dealerships.

90. BMW NA refused and failed to repair the Power Loss defect and to conform the Class Vehicles to their implied warranties.

91. Plaintiffs and the putative class members suffered economic harm because their vehicles are unmerchantable and are worth less than what they paid/pay for them.

92. Plaintiffs and the putative class members suffered economic harm because they bargained for and paid for the 4 year, 50,000 mile warranty, which BMW NA breaches by refusing to repair the Class Vehicles.

93. Plaintiffs and Class Members suffered economic harm, because they would not have purchased/leased the Class Vehicles, but for BMW NA's fraudulent concealment of the Power Loss defect as alleged herein, but would have instead purchased leased the more affordable fully electric BMW i3 models and kept the difference in the price, or would have purchased/leased the non-defective vehicles of other manufacturers instead.

**CLASS DEFINITIONS AND CLASS ALLEGATIONS**

94. This action seeks financial compensation for members of the Class in connection with their lease/purchase of the Subject Vehicles. Plaintiff do not seek: (i) damages for personal, bodily, or emotional injury or wrongful death; or (ii) damages for becoming subject to liability or legal proceedings by others.

95. This action has been brought and may properly be maintained as a class action pursuant to the provisions of FRCP Rule 23 and other applicable law by Plaintiff on behalf of himself and a Class defined as follows:

a) National Class: The Class that Plaintiff seeks to represent ("National Class") is defined to include all persons within the United States who purchased or leased, or will purchase or lease, a Subject Vehicle, on or after Defendants placed the Class Vehicles into the stream of commerce. Excluded from the National Class are Defendants, any parent, subsidiary, affiliate, or controlled person of Defendants, as well as the officers, directors, agents, servants, or employees of Defendants, and the immediate family member of any such person. Also excluded is any trial judge who may preside over this case.

b) California Sub-Class: All members of the nationwide class that reside in the State of California.

96. Numerosity and Ascertainability: The classes are so numerous that individual joinder of all Putative Class Members is impractical under the circumstances. The disposition of the claims of these Putative Class Members in a single action will provide substantial benefit to all parties and the Court. The Putative Class Members can be ascertained by, among other things, information and records in Defendants' possession custody or control, lease/sales records, records kept by the Department of Motor Vehicles of various States and by responses to methods of class notice permitted by law.

97. Typicality: The claims of representative Plaintiff are typical of the claims of the Class in that the representative Plaintiffs, like all Putative Class Members, purchased or leased Class Vehicles designed, manufactured, and distributed by BMW with the defective Range Extender. The representative Plaintiff, like all Putative Class Members, has been damaged by Defendants in that they have incurred or will incur violation of their statutory rights, economic loss, and failure to meet their expectations. Furthermore, the factual basis of BMW NA and BMW AG's misconduct is common to all Putative

Class Members and represents a common thread of fraudulent, deliberate, and negligent conduct resulting in injury to all Putative Class Members.

98. Commonality: Common Questions Predominate: Common questions of law and fact exist as to all Putative Class Members, and predominate over any questions that effect only individual members of the class, if there are any individual questions. The common questions of law and fact include, but are not limited to:

1) Whether the Class Vehicles were designed, manufactured, sold and/or otherwise equipped with the Range Extender ("REx") that is of poor, weak, or inferior design and/or otherwise defective;

2) Whether Defendants knew of the defective nature of the REx (in the United States) on the Class Vehicles;

3) Whether Defendants violated California consumer protection statutes;

4) Whether Defendants breached their express warranties;

5) Whether Defendants breached their implied warranties;

6) Whether Defendants' REx on the Class Vehicles contained an inherent design and/or manufacturing defect;

7) Whether the defect in the REx caused and/or contributed the Class Vehicles to lose power under load, when Class Vehicles were used for their intended purpose (driving);

8) Whether the advertisements and statements made by Defendants were, and are false and/or had and have had a tendency to deceive customers, by either failing to disclose the existence of an inherent defect or misrepresenting that the Class Vehicles contained no defects;

9) Whether Defendants failed to adequately warn and/or notify Putative Class Members and the general public regarding the defects of the REx on the Class Vehicles causing the vehicles' loss of power, loss of acceleration, and inability to navigate a high grade incline due to their inherent design or defect as described herein;

10) Whether Defendants have failed to notify all Subject Vehicle owners or lessees of the defect here at issue and repair or correct (or offer to repair or correct) all defective REx on the Class Vehicles at no cost to the owners or lessees of the Class Vehicles;

11) Whether Defendants are obligated to inform the Class of their right to obtain, free of charge, repair or replacement of the defective REx on the Class Vehicles;

12) Whether Defendants adequately informed Dealers of the remedies to the design or defect as described herein;

13) Whether Defendants are required to pay restitution and be disgorged of the profits they made on the BMW i3 REx.

14) The nature and extent of Defendants' implied warranty of merchantability for the REx;

15) Whether BMW's refusal to make a fix to the REx was a breach of warranty to repair defects in the Class Vehicles, which was part of the basis of the bargain as between BMW and members of the Class;

16) Whether the Plaintiff was entitled, and the putative class is entitled to restitution for the extra money they paid for the REx; and whether defendants are subject to disgorgement of profits as a result of the sale of the REx;

17) Whether the presence of the REx in the Class Vehicles is an unlawful, unfair and/or "fraudulent" business act or practice within the meaning of the B&P Code § 17200 *et seq.*;

18) Whether Defendants concealed from and/or failed to disclose to Plaintiffs and the Class the true defective nature of the REx;

19) Whether Defendants had a duty to Plaintiffs and the Class to disclose the defective nature of the REx;

20) Whether the facts concealed and/or otherwise not disclosed by Defendants with respect to the safety of the BMW i3 REx to Plaintiffs and the Class are material facts;

21) Whether the facts concealed and/or otherwise not disclosed by Defendants with respect to the lackluster acceleration, power loss, range and inability to handle an incline to Plaintiffs and the Class are material facts;

22) Whether Defendants knew that the REx is defective and would result in power loss, inability to properly accelerate, would change the range of said vehicle, fail to navigate inclines and suffer from impaired range, and as such, the Class Vehicles were not suitable for use as passenger vehicles, and otherwise are not as warranted and represented by Defendants;

23) Whether Defendants knew or reasonably should have known about these REx defect(s);

24) When Defendants learned of the REx defect;

25) Whether Defendants continued to lease/sell the Class Vehicles with the defective REx as alleged herein despite their knowledge and/or reckless or negligent disregard of the defect;

26) Whether the Putative Class Members are entitled to restitution in terms of the money they overpaid for the REx;

27) To the extent there exists a fix, the cost repair of the defective REx on the Class Vehicles and any out-of-pocket expenses incurred in connection therewith, and if so, the nature and amount of such damages;

28) Whether Plaintiffs and the Class are entitled to recover damages and the proper measure of damages;

29) Whether Plaintiffs and the Class are entitled to equitable relief, including disgorgement;

30) Whether Plaintiffs and the Class are entitled to declaratory relief sought herein;

31) Whether Plaintiffs and the Class are entitled to injunctive relief sought herein;

32) Whether the REx caused the amount paid for the purchase or lease of the Class Vehicles to be less than the fair market value of a similar priced vehicle; and

33) Whether there is a difference between the fair market value of the Subject Vehicles and the actual value of those vehicles given the presence of the defective REx.

99. Adequate representation: Plaintiff is a member of the Class and will fairly and adequately protect the interests of the members of the class. The interests of the Plaintiff are coincident with, and not antagonistic to, those other members of the class. Plaintiff has retained attorneys who are experienced in Class action litigation. Plaintiff will fairly and adequately represent and protect the interest of the Plaintiff Class. Plaintiff is an adequate representative of the Class, as he does not have interests that are adverse to the interests of the Plaintiff Class. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel, who is competent and experienced in handling complex and class action litigation on behalf of consumers.

100. Superiority and Substantial Benefit: A class action is superior to all other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual members of the Class would create a risk of: (1) Inconsistent or varying adjudications concerning individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and (2) Adjudication with respect to the individual members of the Class would substantially impair or impede the ability of other members of the Class who are not parties to the adjudications to protect their interests. The class action method is appropriate for the fair and efficient prosecution of this action. Individual litigation of the claims brought herein by each Class Member would produce such a multiplicity of cases that the judicial system having jurisdiction of the claims would remain congested for

years. Class treatment, by contract provides manageable judicial treatment calculated to rapidly conclude all litigation of all claims arising out of the aforesaid conduct of Defendants. The certification of the Class would allow litigation of claims that, in view of the expense of the litigation may be sufficient in amount to support separate actions.

## TOLLING OF STATUTE OF LIMITATIONS

101. Any applicable statutes of limitation have been equitably tolled by the BMW entities' affirmative acts of fraudulent concealment, suppression, and denial of the true facts regarding the existence of the inherent defects alleged herein. Such acts of fraudulent concealment include, but are not limited to intentionally covering up and refusing to publicly disclose critical internal memoranda, design plans, studies, Notices of Action, Problem Detail Reports and other reports of failure and injury, as well as affirmative misrepresentations made to people who called or otherwise contacted BMW attempting to identify and resolve this defect. Through such acts of fraudulent concealment, the BMW entities were able to actively conceal from the public for years the truth about the defective design and manufacture of the REx system on the Class Vehicles, thereby tolling the running of any applicable statute of limitations.

102. Defendants are estopped from relying on any statutes of limitation because of their misrepresentation and fraudulent concealment of the true facts, as described herein, concerning the REx system on the Class Vehicles. Defendants were, at all times aware of the true nature of the defects as described herein but at all times continued to manufacture and market the Class Vehicles despite this knowledge.

## FIRST CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

## (Against All Defendants, including Does 1 to 100)

103. Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Class Action Complaint.

104. Plaintiff brings this cause of action on behalf of himself and on behalf of Putative Class Members.

105. BMW NA provided all nationwide purchases and lessees of the Subject Vehicles with the 48 months or 50,000 mile warranty against defects in materials or workmanship ("Warranty").

106. Said Warranty was provided in consideration for the lease/purchase of the Subject Vehicles, became part of the basis of the bargain, because it was incorporated into the lease/purchase agreements of all Class Vehicles.

107. Plaintiffs and the Class Members learned about the existence of such Warranty pre-purchase/pre-lease, and as reasonable persons, relied on the existence of such warranty. Plaintiffs' and Class Member's conduct of purchasing/leasing Class Vehicles is in accordance with their reliance on said Warranty.

108. The Power Loss defect complained herein is a defect in materials and/or workmanship and is covered under the Warranty. Applying any warranty limitation period to avoid the need to repair this particular defect would be unconscionable in that, *inter alia*, the vehicles at issue contain a defect at the time of delivery, BMW NA was either aware of or consciously and/or recklessly disregarded this defect which could not be discovered by Plaintiffs and members of the class at the time of such purchase or lease, and purchasers or lessees lacked any meaningful choice with respect to the warranty terms.

109. Plaintiffs and the Class Members, upon discovery of the defect, presented the Vehicles to authorized BMW NA repair facilities during the warranty coverage period, which denied the existence of the defect, failed to document these visits and concealed the existence of a defect as alleged herein.

110. Plaintiff leased the Subject Vehicle from a BMW authorized dealership and provided notice to Defendant BMW NA of their breach as alleged herein through said BMW authorized dealership.

111. Defendants have and continue to breach said express warranties in the following ways, among others as follows:

a. At the time of manufacture and lease/sale of the Class Vehicles, there existed a defect in the REx;

b. The REx on the Class Vehicles was not free from defects;

c. The REx system on the Class Vehicles was and is at all relevant times defective, including during the time of the Warranty coverage period;

d. BMW has refused to take responsibility for the defective REx on the Class Vehicles, denying all liability or even the existence of the defect as described herein;

e. BMW has engaged in a nationwide conspiracy to cover up the Class Vehicles' REx system defect by systematically refusing to document visits by Plaintiff and other Putative Class Members to authorized dealerships with the subject complaint;

f. By failing to document these visits and provide repair orders BMW has systematically deprived Plaintiff and other Putative Class Members of their rights by distorting the Class Vehicles' repair histories; and

g. BMW NA failed to repair the defects in materials and workmanship attributing to the Power Loss.

112. To date Defendants have failed to remedy their breach and continue to uniformly breach the Warranty.

113. As a direct and proximate cause of Defendants' breach, Plaintiffs and members of the class have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, i.e. the difference between the value of the vehicle as promised and the value of the vehicle as delivered or as proved in trial.

//

//

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY**

**(Against All Defendants, Including Does 1 to 100)**

114. Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Class Action Complaint.

115. Plaintiff brings this cause of action on behalf of himself and on behalf of Putative Class Members.

116. The Class Vehicles are manufactured goods.

117. The transactions by which the Putative Class Members purchased the Subject Vehicles were transactions for the sale of goods and at all times relevant, BMW AG and BMW NA were manufacturers, distributors, and/or designers of Class Vehicles and placed these products into the stream of commerce throughout the United States, including California.

118. Plaintiff and Putative Class Members leased and/or purchased Subject Vehicles from authorized BMW dealers and were the intended beneficiaries of any warranty agreements.

119. Class Vehicles came with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purpose for which they were leased/purchased, were the same quality as those generally accepted in the trade, were not of poor or below average quality within the description and/or conformed to the affirmations of fact made by BMW on the Internet, in its brochures, warranty materials and/or product inserts it provided along with the lease/sale of the Class Vehicles.

120. The REx defect in the Class Vehicles renders them non-conforming goods and/or goods that were not the same quality as those generally accepted in the trade, were not fit for the ordinary purposes for which the goods are used, were of poor or below average quality within the description and/or did not conform to the affirmations of fact made by BMW AG on the Internet, in its brochures, product inserts and/or warranty

materials it provided along with the lease/sale of the Subject Vehicles. BMW NA republished said affirmation of facts that the REx was safe and reliable.

121. The Class Vehicles, at all times relevant herein, were and are not fit for the ordinary purposes for which the goods are used, because the defective REx poses an unreasonable risk to safety of Putative Class Members and passenger(s) of Class Vehicles when they operate the vehicles beyond their purely electric range to use them for their ordinary purposes. The Class Vehicles could never meet the advertised extended mileage unless the road was flat and all components (air conditioner, heater, headlamps, etc.) were turned off; moreover, the vehicles' REx rendered the vehicles unfit under the implied warranty of merchantability because with the REx the vehicles were undrivable as explained herein.

122. The Class Vehicles, at all times relevant herein, were of poor or below average quality.

123. Class Vehicles, at all times relevant herein, did not and do not have the quality that a buyer/lessee would reasonably expect.

124. Class Vehicles, at all times relevant herein, were unsafe and not substantially free of defects as alleged herein.

125. Upon discovering the defect in the REx on the Class Vehicles, Plaintiff took reasonable steps to notify Defendant BMW NA within a reasonable time that the product did not have the expected quality and contained the defects as alleged herein.

126. At all times relevant, BMW NA has failed and/or refused to repair the defects in the REx system of Subject Vehicles, and has failed and refused to do so.

127. As a direct and proximate result of the foregoing, Plaintiff and all the other Putative Class Members sustained significant loss and damage, including but not limited to reduced fair market value and did not receive the benefit of their bargain: they put an extra $3,500 for the REx, which was unusable due to the safety risks it posed.\

//

//

**THIRD CAUSE OF ACTION**

**BREACH OF WARRANTY**

**SONG-BEVERLY CONSUMER WARRANTY ACT, CIVIL CODE § 1790 *et seq.***

**(Against BMW NA and Does 1 to 100)**

128. Plaintiff re-alleges and incorporates by reference as fully set forth herein, all paragraphs of Plaintiff's Complaint.

129. Plaintiff brings this cause of action on behalf of himself and on behalf of the members of California Sub-Class against all Defendants.

130. The transactions by which the Putative Class Members purchased the Subject Vehicles were transactions for the sale of goods and at all times relevant, Defendants were manufacturers, distributors, and/or designers of Class Vehicles and placed these products into the stream of commerce throughout the United States, including California.

131. Defendants were at all relevant times, jointly and severally, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

132. The Class Vehicles are manufactured goods.

133. Class Vehicles came with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purpose for which they were leased/purchased, were the same quality as those generally accepted in the trade, were not of poor or below average quality within the description and/or conformed to the affirmations of fact made by BMW specifically that items in its packages for specific vehicles were safe, warranty materials, and more generally in its product inserts, it provided along with the lease/sale of the Class Vehicles.

134. The REx defect in the Class Vehicles renders them non-conforming goods and/or goods that were not the same quality as those generally accepted in the trade, were not fit for the ordinary purposes for which the goods are used, were of poor or below

average quality within the description and/or did not conform to the affirmations of fact made by BMW in its labeling, product inserts and/or warranty materials it provided along with the lease/sale of the Class Vehicles.

135. The Subject Vehicles, at all times relevant herein, were and are not fit for the ordinary purposes for which the goods are used, namely as a reasonably safe means of transportation, because the defective REx poses an unreasonable safety risk to Putative Class Members and passenger(s) of Class Vehicles when they operate the vehicles beyond their purely electric range to use them for their ordinary purposes.

136. Subject Vehicles, at all times relevant herein, did not and do not have the quality that a buyer/lessee would reasonably expect.

137. The BMW entities advertised the safety of the REx system and/or the safety and reliability of BMW vehicles through various means to Plaintiff and Putative Class Members with an intent to sell class vehicles.

138. BMW's written representations in the warranty manual(s), website, sales brochures, pamphlets, and other writings disseminated by BMW in the promotion, marketing, and sales of the Class Vehicles constitute an express warranty and/or warranties to Plaintiff and the Putative Class Members.

139. BMW's written representations in the warranty manual(s), website, sales brochures, pamphlets and other writings disseminated by BMW in promotion, marketing and sales of the Class Vehicles regarding the safety and reliability of Vehicles and the safety and reliability of the REx were false representations of fact, that were known by the Defendants to be untrue at the time they were made and were intended to create reliance.

140. The BMW entities breached the express warranty by failing to make the REx system safe and reliable as it was described.

141. The BMW entities breach caused injury to Plaintiff and Putative Class Members, because Plaintiff and Putative Class Members did not get the benefit of their bargain, which included, *inter alia*, a safe and reliable REx system.

142. Plaintiff DEMIRCHYAN provided notice to Defendant BMW NA of their breach as alleged herein.

143. Upon discovering the defects in the REx on the Subject Vehicles, Plaintiff took reasonable steps to notify Defendant BMW NA within a reasonable time that the product did not have the expected quality and contained the defects as alleged herein.

144. At all times relevant, BMW NA has failed and/or refused to repair the defects in the REx system of the Subject Vehicles, and has failed and refused to do so at no charge to the Putative Class Members.

145. As a direct and proximate result of the foregoing, Plaintiff and all the other Putative Class Members sustained significant loss and damage, including but not limited to reduced fair market value and did not receive the benefit of their bargain.

**FOURTH CAUSE OF ACTION**

**BREACH OF WARRANTY**

**MAGNUSON-MOSS WARRANTY ACT, 15 U. S. C. § 2301 et seq.**

**(Against BMW NA, and Does 1 to 100)**

146. Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Class Action Complaint.

147. The Subject Vehicles and respective REx system on the Subject Vehicles are "consumer products" as that term is defined by 15 U. S. C. § 2301(1).

148. Plaintiff and Class Members are "consumers" as that term is defined by 15 U. S. C. § 2301(3).

149. BMW NA is a "supplier" as that term is defined by 15 U. S. C. § 2301(4).

150. BMW NA is a "warrantor" as that term is defined by 15 U. S. C. § 2301(5).

151. BMW NA provided Plaintiff and Class members with "written warranties" as that term is defined by 15 U. S. C. § 2301(6).

152. The amount in controversy of the Plaintiff's individual claim meets or exceeds the value of $25.00. In addition, the amount in controversy meets or exceeds the

value of $75,000.00 (exclusive of interests and costs) computed on the basis of all claims to be determined in the suit.

153. Section 15 U. S. C. § 2310(d)(1) provides that a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state or in an appropriate District Court of the United States.

154. BMW NA made statements in its advertising, promotion, marketing and sales of the Subject Vehicles, and by operation of law, constitute implied warranties that these vehicles are merchantable and fit for their intended purpose.

155. At all times relevant, Defendants had reason to know at the time of the lease/sale and delivery of the Subject Vehicles that they were required for a particular purpose, namely as means of safe transportation on the roads and highways of California and throughout the United States on the daily basis, and the REx was meant to extend the range of the BMW i3 without risk or danger of losing power, acceleration, ability to pass or go uphill, or placing consumers at increased risk of automobile collisions.

156. The consumers' reasonable expectation was that the Subject Vehicles would function without an increased risk of car accidents or the need to retrofit the REx during the ordinary and regular course of using a motor vehicle, and that the purchasers, owners and/or lessees were relying on the manufacturer's skill and judgment to develop, design, manufacture, distribute, and sell a vehicle with a suitable REx system.

157. BMW advertised the safety and reliability of the REx system and/or the safety of BMW vehicles through various means to Plaintiff and Putative Class Members with an intent to sell Class Vehicles.

158. BMW's written representations in the warranty manual(s), website, sales brochures, pamphlets, and other writings disseminated by BMW in the promotion, marketing, and sales of the Class Vehicles constitute an express warranty and/or warranties to Plaintiff and the Putative Class Members.

159. BMW's written representations in the warranty manual(s), website, sales brochures, pamphlets and other writings disseminated by BMW in promotion, marketing and sales of the Class Vehicles regarding the safety and reliability of Vehicles and the safety and reliability of the REx were false representations of fact, that were known by the Defendants to be untrue at the time they were made and were intended to create a reliance.

160. BMW breached the express warranty by failing to make the REx system safe and reliable as it was described.

161. BMW's breach caused injury to Plaintiff and Putative Class Members, because Plaintiff and Putative Class Members did not get the benefit of their bargain, which included, *inter alia*, a safe and reliable REx system.

162. Plaintiff DEMIRCHYAN provided notice to Defendant BMW NA of their breach as alleged herein.

163. Defendants breached these implied warranties by offering, selling or leasing the Subject Vehicles that, by their design and construction, contained defects that made the REx inherently dangerous. BMW NA also breached these warranties by failing to warn Plaintiff and the Class Members of the defects as alleged herein, which were, at all relevant times known to BMW NA.

164. Defendants have and continue to breach said express warranties, including but not limited to, as follows:

a. At the time of manufacture and lease/sale of the Subject Vehicles, there existed a defect in the REx system;

b. The REx system on the Subject Vehicles was not free from defects;

c. The REx system on the Subject Vehicles was and is at all relevant times defective;

d. BMW NA has refused to take responsibility for the defective REx on the Subject Vehicles, denying all liability or even the existence of the defect as described herein;

e. BMW NA has engaged in a nationwide conspiracy to cover up the Subject Vehicles' REx defect by systematically refusing to document visits by Plaintiff and other Class members to authorized dealerships with the subject complaint;

i. BMW NA failed to repair the defects in materials and workmanship attributing to the Power Loss; and

f. By failing to document these visits and provide repair orders BMW NA has systematically deprived Plaintiff and other Class members of their rights by distorting the Subject Vehicles' repair histories.

165. Because of BMW NA's breach of warranties as set forth above, Plaintiff and members of the class have suffered damages in an amount to be determined at trial, including but not limited to the cost of repair or retrofit of the REx system on the Subject Vehicles and any out-of-pocket expenses associated therewith. Plaintiff and members of the class are also entitled to an order of the Court requiring BMW NA to provide repair and replacement of the defective REx on the Subject Vehicles.

166. Plaintiff and members of the Class are also entitled to a refund or reimbursement for all amounts they have paid to have the REx system repaired and/or retrofitted and seek any other legal or equitable relief to be determined at the time of trial.

## FIFTH CAUSE OF ACTION

## CALIFORNIA UNFAIR COMPETITION LAW,

## BUSINESS AND PROFESSIONS CODE § 17200 *et seq*.

## (Against All Defendants, Including Does 1 to 100)

167. Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Class Action Complaint.

168. Plaintiff brings this claim on behalf of himself and others similarly situated in her representative capacity as a private attorney general against all Defendants for their unlawful, unfair, fraudulent, untrue and/or deceptive business acts and/or practices pursuant to California Business and Professions Code § 17200 *et seq.* ("UCL"), which prohibits all unlawful, unfair and/or fraudulent business acts and/or practices.

169. Plaintiff asserts these claims as they are representative of an aggrieved group and as a private attorney general on behalf of the general public and other persons who have expended funds that the Defendants should be required to pay or reimburse under the restitutionary remedy provided by California Business and Professions Code § 17200 *et seq.*

170. Plaintiff has standing to bring this claim on behalf of himself and others similarly situated pursuant to California Business and Professions Code § 17200 *et seq*, because Plaintiff suffered injury-in-fact, *inter alia*, because Plaintiff would not have purchased the Class Vehicle, if he had known about the dangerous REx defect on the Class Vehicle manufactured, distributed, and sold by Defendants. Plaintiff also did not receive the benefit of the bargain and/or overpaid for his vehicle, making lease payments that were too high. Had Plaintiff known of the defective REx, he could have instead bought a BMW i3 *without* REx for $3,500.00, or a different vehicle such as a Lincoln MKZ, Nissan Leaf, or Toyota Prius.

171. Plaintiff has standing to bring this claim on behalf of himself and others similarly situated, because Plaintiff suffered injury-in-fact, *inter alia*, because Plaintiff paid valuable consideration for BMW NA's 4 year and 50,000-mile express warranty, which was breached.

172. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants as alleged herein constitute unlawful, unfair and/or fraudulent business acts and/or practices within the meaning of California Business and Professions Code § 17200 *et seq*.

173. The acts, omissions, misrepresentations, practices, non-disclosures and/or concealments of material facts, and/or deception alleged in the preceding paragraphs occurred in connection with Defendants' conduct of trade and commerce in California.

174. As a direct and proximate result of the aforementioned acts, Defendants, and each of them, received monies expended by Plaintiff and others similarly situated who leased/purchased the Subject Vehicles.

175. Defendant BMW AG, independently and jointly with the defendant BMW NA, designed the REx system to meet certain federal and California regulations, entitling the consumers to tax credits and rebates, and knowingly did it in such a way as to make the BMW i3 with REx operate in a substandard way. Consequently, since 2014 if not before, Defendants BMW AG and BMW NA both knew that the REx system was inadequate, because Defendants themselves knowingly designed the system to be inadequate.

176. Defendants manufactured, distributed, and sold/leased the Class Vehicles to Plaintiff and the Class Members.

177. Class Vehicles had at the time of manufacturing, distributing, manufacturing, and selling a known tendency of losing power, acceleration, ability to climb inclines, and the overall driving range, when operating in the REx mode.

178. Defendants gained exclusive knowledge about the Power Loss defect prior to the sale and distribution of the Class Vehicles from sources not available to Plaintiff and the putative class as alleged herein.

179. BMW NA and BMW AG knew that the Class Vehicles had the risk of exposing the Class Members to increased danger of car accidents, because in the REx mode, the Class Vehicles would experience a loss of power, as alleged herein.

180. The tendency of losing power, acceleration, ability to climb inclines, and the overall driving range was an ever-present substantial danger when the Plaintiff and the Class Members used the Class Vehicles for their ordinary purpose of transportation.

181. Ordinary consumers would not have and did not recognize the likelihood of the Class Vehicles experiencing the above-described issues because they are not familiar with the technological principles of the operation of a Range Extender on a plug in hybrid vehicle.

182. Ordinary consumers would not have and did not recognize the likelihood of the Class Vehicles experiencing the above-described issues because they relied on BMW's experience and expertise in designing, manufacturing, and selling vehicles that will be safe and reliable.

183. BMW NA and BMW AG failed to adequately warn the Plaintiff and the Class Members of the potential tendency of losing power, acceleration, ability to climb inclines, and the overall driving range, when operating in the REx mode, thanks to the operation of the REx system as alleged herein.

184. The misrepresentation of BMW NA had a material effect on the decision as to whether to buy the BMW i3 with REx or the i3 without REx. Had the defect been disclosed by BMW NA and/or by Pacific BMW, Plaintiff and those similarly situated would never have purchased the i3s with REx.

185. Had BMW NA and/or Pacific BMW made the disclosure and/or had Plaintiff and those similarly situated been aware of the information regarding the loss of power, acceleration, etc., Plaintiff and those similarly situated would have known of the defect in the BMW i3 with REx.

186. Based on balancing the welfare of the community and public interest, the utility to BMW NA and BMW AG, and each of them, is *de minimis*, so that the conduct of the BMW entities is morally reprehensible, unethical, and unscrupulous. BMW's practice is offensive to public policy and is immoral and substantially injurious to consumers.

187. The benefit to the society from BMW NA's unfair conduct is outweighed by the dangerous nature of BMW i3 REX vehicles.

188. BMW AG and BMW NA fraudulently concealed the existence of the REx defect from Plaintiff and the Putative Class Members.

189. BMW AG and BMW NA intended to deceive Plaintiff and Class Members by concealing the REx defect, motivated by market share and profit margin.

190. BMW AG and BMW NA disclosed some facts to Plaintiff on their websites and print marketing materials, but intentionally failed to disclose that the REx system will pose an unreasonable reliability issue and safety hazard to Putative Class Members and passengers of Class Vehicles.

191. At all times relevant herein, the existence of the REx defect was a material fact, because it concerned the safety of the Plaintiff, Putative Class Members, their passenger(s), and their family member(s).

192. On information and belief, at all times relevant herein, BMW AG prepared the general descriptions of various options and packages as a base. Similarly, upon information and belief, each country with a significant market share was given the ability to adjust said marketing to the domain but <u>never</u> below the BMW AG baseline, set in Germany. Yet, said description was false for the United States.

193. On information and belief, at all times relevant herein BMW AG prepared the general descriptions of various options and packages as a base. BMW NA's above referenced description of the REx was derived from BMW AG's base description, which contained the representation that REx safely and reliably extends the driving range of the BMW i3. BMW AG knew that said description would be used in the United States.

194. As alleged herein, both BMW AG and BMW NA knowingly promoted and advertised their Class Vehicles in an unlawful, unfair, fraudulent, untrue, and/or deceptive manner that is and was likely to deceive the public.

195. These advertisements, due to the national scope and extent of Defendants' multi-media campaign, were uniformly made to all members of the class. Class Members' acts of leasing and/or purchasing the Subject Vehicles were consistent with basing such decisions upon such advertisements, inclusive of the increased range of the

REx, the 4 year/50,000 mile warranty, and that the vehicle would be safe, which thus formed part of the basis for the transaction at issue, or the benefit of the bargain, which was material; had Plaintiff and the putative Class Members known differently as to the reliability and safety of the REx, they would not have purchased said REx as described herein or would have bought an i3 without the REx.

196. BMW AG's and BMW NA's conduct constitutes unfair acts or practices conducted in the course of Defendants' respective businesses, and thereby constitutes violations of California Business and Professions Code § 17200 *et seq*. BMW AG's and BMW NA's conduct and intent to widely market the Subject Vehicles to California consumers involved false and misleading advertising. Such conduct offends the established public policy of the State of California and is immoral, unethical, oppressive, unscrupulous, and substantially injurious.

197. Pursuant to California Business and Professions Code § 17203 of the UCL, Plaintiff seeks an order of this Court enjoining BMW AG and BMW NA from continuing to engage in unlawful, unfair or fraudulent business practices, and any other act prohibited by the UCL.

198. In addition to the relief requested in the Prayer below, Plaintiff seeks the imposition of a constructive trust over, and restitution of, the monies collected and profits realized by Defendants.

199. BMW AG's and BMW NA's conduct, as fully described herein, constitutes acts of untrue and misleading advertising and is, by definition, violation of California Business and Professions Code § 17200 *et seq.*

200. The unlawful, unfair, deceptive, and/or fraudulent business practices and/or false and misleading advertising of BMW AG and BMW NA, as described herein, present a continuing threat to the public to be injured by the Subject Vehicles equipped with the defective REx as alleged herein.

//

//

**SIXTH CAUSE OF ACTION**

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

**18 U.S.C. § 1962(c)-(d)**

**(Against All Defendants, Including Does 1 to 100)**

201. Plaintiff re-alleges and incorporates by reference as fully set forth herein all paragraphs of Class Action Complaint.

202. Plaintiff brings this Count on behalf of the Nationwide Class against the following Defendants: BMW NA, BMW AG, and Does 1 to 100 (inclusively, for purpose of this cause of action, the "RICO Defendants").

203. BMW conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity. At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

204. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

205. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. §1962(d).

206. For many years, the RICO Defendants aggressively sought to increase their sales of the electric vehicles, including the Class Vehicles, in an effort to bolster their revenues, augment profits, and increase their market share of the electric vehicle market. In pursuit of such increase, the RICO Defendants resorted to deception and/or deceit through their fraudulent scheme and conspiracy. In particular, the RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "REx RICO Enterprise"), whose purpose was to deceive the consumers into believing that the Class Vehicles were (1) an alternative to

fossil fuel automobiles that pollute the environment and deplete the ozone layer, thereby entitling the consumers to federal tax credits and state rebates, and (2) safely and reliably provided the extended driving range valued by consumers. The deception aimed to increase revenues and minimize losses from the design, manufacture, distribution, and sale of the Class Vehicles and the REx systems installed therein. As a direct result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of many millions of dollars from Plaintiff and the Class. As explained in detail below, the RICO Defendants' misconduct violated Sections 1962(c) and (d).

### A. Description of the REx RICO Enterprise

207. In an effort to expand its global reach, market share, and standardized marketing and sales in the U.S., BMW AG, a German company, formed BMW NA, a separate Delaware company, which is headquartered in New Jersey. At all relevant times, BMW AG maintained tight control over the design, manufacture, and testing of the Class Vehicles.

208. At all relevant times, the RICO Defendants, along with other individuals and entities, including DOE 1, which designed and manufactured the range extender electrical machine electronics for the i3, and DOE 2, which created the software that controls the REx operation and limits the fuel tank size, making the vehicles eligible for tax credits and rebates, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently misrepresenting the poor and unsafe performance of the BMW i3 REx (in the REx mode) in order to import and sell the Class Vehicles containing the REx throughout the U.S., and through which they conducted a pattern of racketeering activity under 18 U.S.C. §1961(4).

209. Alternatively, BMW NA constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. §1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in the U.S. Specifically, BMW NA is the entity through which BMW distributed and sold the Class Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the U.S. stream of

commerce. And, on information and belief, BMW AG used BMW NA to distribute and sell the Class Vehicles throughout the U.S. BMW NA's separate legal status facilitated the fraudulent scheme and provided a hoped-for shield from liability for the RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "REx RICO Enterprise."

210. At all relevant times, the REx RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as legal entities, as well as individuals and entities associated-in-fact for the common purpose of engaging in RICO Defendants' profit-making scheme.

211. On information and belief, the association-in-fact REx RICO Enterprise consisted of the following entities and individuals: BMW AG, BMW NA, the BMW entities' directors, officers, and engineers, whose identities are to be ascertained, DOE 1, which designed and manufactured the range extender electrical machine electronics for the i3, and DOE 2, which created the software that controls the REx operation and limits the fuel tank size, making the vehicles eligible for tax credits and rebates.

212. BMW NA is a distinct legal entity, but it is controlled (directly or indirectly) by Defendant BMW AG.

213. In 2011, BMW introduced a new sub-brand, BMW i, and announced the first two models under the sub-brand: BMW i3 and BMW i8. The vehicles were to be marketed using the i-brand tagline "born electric," and BMW claimed that the i-brand would combine "*what is good for us with what is good for the planet*".[3] Thus, BMW desired to expand its involvement in the electric car market.

214. As stated above, the BMW i3 originally came on the market as a purely electric vehicle in Europe. Subsequently, the BMW i3 *with REx* came on the market in Europe. However, the U.S. market presented certain distinctive circumstances. In particular, there were certain federal and California regulations, which entitled the

[3] "BMW introduces new i sub-brand. Green Car Congress. 2011-02-21.

vehicles that complied to tax credits and rebates. The tax credits and rebates made such vehicles more attractive to consumers.

215. Based on information and belief, BMW determined that the BMW i3 REx, as marketed in Europe, did not comply with the federal and California regulations, entitling consumers to tax credits and rebates. BMW also determined that the BMW i3 REx could not be modified to comply with the federal and California regulations without negatively affecting its range.

216. To achieve their lofty sales goals, the BMW RICO Defendants made a business-driven decision to modify the BMW i3 REx for the U.S. market, so that the vehicle would comply with the federal and California regulations, entitling consumers to tax credits and rebates. Critically, however, the REx, as modified, would lead to significant loss of performance, affecting the vehicles' safety and reliability.

217. Accordingly, working with the other members of the REx RICO Enterprise, the BMW RICO Defendants devised a scheme to misrepresent the BMW i3 REx vehicles to consumers as both compliant with regulations (thereby, entitling the consumers to tax credits and rebated) and also providing the extended driving range that the consumers valued. Thereby, the RICO Defendants were able to increase the sales of the BMW i3 REx, even though the vehicles they sold were unsafe and deceptively described. The negative effect of the REx modification for the U.S. and CA markets on the vehicles safety and reliability was concealed from the consumers.

218. In sum, as part of their effort to increase the sales of BMW electric vehicles, the BMW RICO Defendants controlled and directed a multi yearlong enterprise with the common purpose of deceiving the public to increase their market shares and profits, and minimize losses.

//

//

//

**B. The REx RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

219. The REx RICO Enterprise began approximately in 2012, when the CARB adopted the regulations for vehicles with auxiliary power units, including Section 1962.1. The REx RICO Enterprise has continued without interruption until the present time.

220. At all relevant times, the REx RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the BMW Defendants, their network of dealerships, DOE 1, DOE 2, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Vehicles to Plaintiff and the Class Members through deceptive and misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the REx RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud the Class Members.

221. The REx RICO Enterprise functioned by selling vehicles to the consuming public. Many of these products are legitimate, including vehicles that do not contain the REx. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

222. The REx RICO Enterprise engaged in, and its activities affected interstate commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the sale of the same.

223. Within the REx RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The REx RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

224. Each participant in the REx RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the REx RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

225. The RICO Defendants participated in the operation and management of the REx RICO Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

226. The BMW RICO Defendants exerted substantial control over the REx RICO Enterprise, and participated in the affairs of the REx RICO Enterprise by:

a) failing to correct the U.S. market REx system when warned about its shortcomings;

b) transitioning their electric vehicle design away from an effective REx system offered in Europe and adopting instead the modified REx system technology for the U.S. market that negatively affects the vehicles' performance, safety, and reliability;

c) designing the Class Vehicles with the modified REx system;

d) manufacturing, distributing, and selling the Class Vehicles that placed the consumers in increased danger of car accidents;

e) misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications and performance;

f) introducing the Class Vehicles into the stream of U.S. commerce in an unsafe condition;

g) concealing the decreased performance and safety of the vehicles from the public, while emphasizing the entitlement to tax credits and rebates;

h) persisting in the manufacturing, distribution, and sale of the Class Vehicles even after questions were raised about the problems experienced by consumers while operating the vehicles in the REx mode;

i) misleading the driving public as to the nature of the REx system and the defects in the Class Vehicles;

j) designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

k) otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

l) collecting revenues and profits from the sale of such products; and

m) ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

227. Without the RICO Defendants' willing participation, the REx RICO Enterprise's scheme and common course of conduct would not have been successful.

228. The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

**C. Mail and Wire Fraud**

229. To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the REx RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the REx RICO Enterprise through a pattern of racketeering activity within the meaning

of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and §1343 (wire fraud).

230. Specifically, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§1341 and 1343), within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the REx RICO Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

231. The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

232. In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and the Class Members or to obtain money from Plaintiff and the Class Members by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

233. The RICO Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

a) Mail Fraud: The RICO Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful

scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

b) Wire Fraud: The RICO Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

234. The RICO Defendants' use of the mails and wires, for the purpose of executing the illegal scheme, include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a) the Class Vehicles themselves;
b) component parts for the REx;
c) essential hardware for the Class Vehicles;
d) policy and procedure manuals, inclusive of repair manuals, warranty manuals, technical training manuals, and Service Information Bulletins (SIBs);
e) emission tests;
f) upon information and belief, certificates for Clean Air Vehicle decals/stickers;
g) documents and communications that facilitated the tax credits and rebates;
h) false or misleading communications intended to lull the public and regulators from discovering the defect in the U.S. market REx;
i) sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true performance and reliability of the Class Vehicles;

j) documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

k) documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

l) millions of dollars in compensation to the BMW entities' directors, officers, and engineers, participating in the REx RICO Enterprise, whose identities are to be ascertained;

m) deposits of proceeds; and

n) other documents and things, including electronic communications.

235. The RICO Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, BMW NA, under the direction and control of BMW AG, made misrepresentations about the Class Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, safety, reliability, and other performance metrics.

236. The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

237. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as exposing consumers to increased danger of car accidents, despite their advertising campaign that emphasized the vehicles' increased driving range.

238. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of,

and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

239. The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d), the RICO Defendants conspired to violate 18 U.S.C. §1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

240. The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses.

241. To achieve their common goals, the RICO Defendants hid from the general public the dangers of the Class Vehicles and obfuscated the true nature of the defect even after some consumers raised concerns. The RICO Defendants suppressed and/or ignored warnings from the consumers and third parties about the conflict between complying with the federal and state regulations, which entitled consumers to tax credit and rebates, and the safety/reliability of the Class Vehicles.

242. The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

243. Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

244. The RICO Defendants knew and intended that Plaintiff and the Class members, would rely on the material misrepresentations and omissions made by them about the Class Vehicles. The RICO Defendants knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiff, along with hundreds of thousands of other consumers, relied upon Defendants' representations and omissions that were made or caused by them. Plaintiff's reliance is made obvious by the fact that he leased the vehicle that never should have been introduced into the U.S. stream of commerce and whose worth is significantly less because of its defective condition.

245. As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiff and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

246. The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiff and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the REx RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

247. During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared technical, marketing, and financial information

that revealed that the vehicles, in order to comply with the federal and state regulations, entitling the consumers to tax credits and rebates, sacrificed their safety and reliability. Nevertheless, the RICO Defendants shared and disseminated information that deliberately misrepresented the Class Vehicles as safe and reliable.

248. By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a) Purchase or lease of a defective Class Vehicle;

b) Overpayment for a Class Vehicle, in that Plaintiff and Class members believed they were paying for a vehicle that met certain safety and reliability standards and obtained a vehicle that was anything but;

c) The value of the Class Vehicles has diminished, thus reducing their resale value;

d) Other out-of-pocket and loss-of-use expenses; and

e) Payment for alternative transportation.

249. The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**PRAYER**

250. WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, and on behalf of the general public, prays for judgment against Defendants as follows:

a. An order certifying the Class, sub-classes and appointing Plaintiff and her counsel to represent the Class and sub-Classes;

b. For actual damages;

c. For statutory damages in an amount of not less than $1,000 per Plaintiff or Class member pursuant to California Civil Code § 1780(a)(1) (as to BMW NA only);

d. Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under Civil RICO (as to BMW NA only);

e. For restitution, as appropriate;

f. For statutory pre-judgment interest;

g. For any additional and consequential damages suffered by Plaintiff and the Class;

h. For reasonable attorneys' fees and the costs of this action;

i. For an order enjoining Defendants from the conduct alleged herein;

j. For declaratory and/or equitable relief under the causes of action stated here; and

k. For such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for himself and the Class on all claims so triable.

Dated: December 6, 2016

THE MARGARIAN LAW FIRM

By: *<u>/s/ Hovanes Margarian</u>*

Hovanes Margarian
hovanes@margarianlaw.com
Attorneys for Plaintiff
Hakop Demirchyan
and those similarly situated.